FILED

DEC 14 2012

SUSAN M SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**ORDERED PUBLISHED**

## UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | BAP No.   NC-12-1081-MkHPa |
| RAUL MACHUCA, JR., | Bk. No.   10-55227 |
| Debtor. | Adv. No.   10-05301 |
| HERITAGE PACIFIC FINANCIAL, LLC, | |
| Appellant, | |
| v. | **O P I N I O N** |
| RAUL MACHUCA, JR., | |
| Appellee. | |

Argued and Submitted on October 18, 2012
at San Francisco, California

Filed – December 14, 2012

Appeal from the United States Bankruptcy Court
for the Northern District of California

Honorable Charles D. Novack, Bankruptcy Judge, Presiding

Appearances:   Brad A Mokri, Esq. argued for Appellant Heritage Pacific Financial, LLC; and Stanley Zlotoff, Esq. argued for Appellee Raul Machuca, Jr.

Before:   MARKELL, HOLLOWELL and PAPPAS, Bankruptcy Judges.

MARKELL, Bankruptcy Judge:

## I.   INTRODUCTION

Heritage Pacific Financial, LLC ("HPF") sued debtor Raul Machuca, Jr. ("Machuca"), alleging that a debt incurred by Machuca was nondischargeable.  HPF not only lost, but the bankruptcy court entered summary judgment for Machuca.  HPF did not appeal that order.  Machuca thereafter sought an award of roughly $9,000 in attorneys' fees under 11 U.S.C. § 523(d).[1] The bankruptcy court granted Machuca's attorneys' fees motion.  HPF then appealed from the fee order.  We AFFIRM.

## II.   FACTS

In January 2007, Machuca purchased a single-family residence in Salinas, California ("Property").  To finance his purchase, Machuca obtained two real estate secured loans.  The senior loan was for $1 million.  The junior loan, which is the subject of this appeal, was for $147,000 ("Loan").  It was made by National City Bank ("National City").

Most of Machuca's actions in obtaining the Loan are undisputed.  In December 2006, Machuca telephoned Westar Real Estate and Mortgage, a loan brokerage firm, seeking to obtain a loan to purchase the Property.  During this phone call, Machuca answered many questions regarding his finances.  These included the name of his employer and the amount of his salary.

---

[1]Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and all "Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

Sometime later, Machuca was notified that National City had approved his Loan. He was asked to and did attend a meeting to sign the necessary loan documentation. At the meeting, he signed and initialed a stack of documents. Machuca testified that he did not read any of the documents, although he admits that he signed them in order to obtain the Loan. These documents included a standard form loan application ("Application").

Most of the documents that Machuca signed are not in the record before us. We do have, however, multiple copies of the Application signed by Machuca. They are each dated January 16, 2007. We also have multiple copies of the signed promissory note ("Note"). They are each dated January 12, 2007 – four days before the date of the Application.

The record also includes:

1. An unsigned and undated version of the Application ("Unsigned Application"), presumably filled out by Westar during or after the telephone call between Machuca and Westar.

2. A document entitled Uniform Underwriting and Transmittal Summary ("Underwriting Summary").

3. A Buyer Estimated Closing Statement ("Closing Statement") dated January 16, 2007, and referring to a closing date of January 17, 2007.

4. Closing Instructions from National City to Chicago Title Co. ("Closing Instructions") anticipating a disbursement date of January 17, 2007.

The Application stated that Machuca was a correctional

3

officer who had worked for the California Department of Corrections for five years. That much was true. It also stated, however, that his "base employment income" was $20,725 per month, or almost $250,000 a year. That was untrue. According to Machuca, however, not only was the stated salary amount false, it was patently absurd.[2] For purposes of this litigation, however, both sides agreed that the $20,750 amount was inaccurate.

Machuca made his Loan payments for a little over a year. He then defaulted. After several more years, in May 2010, he filed a chapter 13 bankruptcy. During this time, HPF had acquired National City's rights under the Loan. After Machuca filed his bankruptcy, HPF filed an adversary proceeding seeking a determination that the Loan was a nondischargeable debt under § 523(a)(2)(A) and (B).

Machuca responded by filing a motion to dismiss the § 523(a)(2)(A) claim, which the bankruptcy court granted. Machuca then filed a motion for summary judgment on HPF's

_____

[2]The Unsigned Application and the Underwriting Summary listed Machuca's income differently than did the Application. Those documents listed his base employment income as $7,250 per month, plus additional "other income" of $13,475 per month. According to the Unsigned Application, $3,725 of the "other income" consisted of Machuca's overtime wages. The source of the remaining $9,750 per month in "other income" was not specifically described in either document.

These documents perhaps suggest that whoever filled out the final version of the Application erroneously listed Machuca's claimed aggregate monthly income – his base employment income and his "other income" – as his base employment income.

4

remaining § 523(a)(2)(B) claim.[3]

In his summary judgment motion, Machuca primarily argued a lack of reasonable reliance on the Application. He asserted that National City did not actually rely on his income representation and that, even if it did, such reliance would have been unreasonable. Machuca's argument focused on the discrepancies in income between the Application and the Unsigned Application. Machuca also noted that the cover sheet accompanying the Underwriting Summary identified the loan type as a "stated income" loan, the upshot of which was that National City had never asked Machuca to provide any tax returns or pay stubs to verify any of his income.[4] Machuca further pointed out

---

[3]Section 523(a)(2)(B) provides that a debt is nondischargeable if the debtor obtained "money, property, services, or an extension, renewal, or refinancing of credit" by using a statement in writing -

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive . . . .

11 U.S.C. § 523(a)(2)(B).

[4]By identifying his Loan as a stated income loan, Machuca implicated the now-discredited practice of indiscriminately making mortgage loans without verifying the income stated on the loan application. Lenders who made these so-called "liar's loans" often did not care what income the borrowers listed and sometimes actively encouraged misstatements of income. Indeed,
(continued...)

5

that the dates on the loan documents indicated that National City had approved the Loan before he signed the Application.

In its opposition to the summary judgment motion, HPF contested Machuca's claim of a lack of reasonable reliance. It supported its contentions with three items of evidence: (1) the language in the Application; (2) the declaration of HPF's managing partner Ben Ganter ("Ganter"); and (3) the declaration of HPF's expert Mark G. Schuerman ("Schuerman").

According to HPF, the Application's certification of the truth and correctness of the Application's information supported both National City's and HPF's reliance without HPF's introduction of any independent evidence of that reliance. In the same vein, HPF also pointed to the Application's provision stating that the lender and its successors and assigns "may rely" on the information in the Application.

Ganter's declaration attempted to establish that both National City and HPF had relied on the information regarding Machuca's income set forth in the Application. Although possibly relevant for HPF, Ganter's declaration did not explain

---

[4] (...continued)
the economic incentives associated with originating such high-risk, high-interest rate loans led some brokers to falsify loan applications without the borrower's knowledge or active participation. For a discussion of these and related points, see Charles W. Murdock, Why Not Tell the Truth?: Deceptive Practices and the Economic Meltdown, 41 Loy. U. Chi. L.J. 801, 843-46 (2010); see also Andrea J. Boyack, Lessons in Price Stability from the U.S. Real Estate Market Collapse, 2010 Mich. St. L. Rev. 925, 947-50 (2010); Patricia A. McCoy, Andrey D. Pavlov & Susan M. Wachter, Systemic Risk Through Securitization: the Result of Deregulation and Regulatory Failure, 41 Conn. L. Rev. 1327, 1351-53 (2009).

how he would have any reason to know anything about National City's reliance.

Finally, Schuerman opined that both lenders and loan purchasers routinely rely on the certifications, acknowledgments and information contained in loan applications, and that this reliance is a crucial factor in the secondary mortgage market. He also opined that income representations are particularly important to junior secured debt holders and purchasers because any collateral supporting their junior position would be lost if a senior lienholder foreclosed.

Schuerman did not attempt to give any opinion as to how the types of patent defects evident in Machuca's application might have affected a lender's or a successor's reliance. In fact, Schuerman's declaration mostly ignored: (1) the income discrepancies between the Application and the Unsigned Application; (2) the implausible amount of base employment income claimed by a five-year state corrections officer; (3) the last-minute signing of the Application, just before funding of the Loan and after the date of the promissory note; (4) National City's approval and funding of the Loan without income verification; and (5) HPF's purchase of the loan without income verification.[5]

_____

[5]Schuerman did claim that HPF and the secondary mortgage market typically rely on the "stated income" in loan applications. If he meant to suggest, however, that such reliance actually and reasonably occurs without independent income verification, especially when there are red flags extant on the face of the loan documents, his suggestion contradicts everything that has been revealed about stated income loans in

(continued...)

7

The bankruptcy court heard the summary judgment motion on November 28, 2011. It adopted Machuca's lack-of-reliance argument, and granted summary judgment. According to the bankruptcy court, Boyajian v. New Falls Corp. (In re Boyajian), 564 F.3d 1088 (9th Cir. 2009) made only the original lender's reliance relevant with respect to § 523(a)(2)(B)'s reliance element.[6]

The bankruptcy court further ruled that HPF had not met its burden of presenting evidence from which National City's actual or reasonable reliance could be inferred. HPF attempted to show reasonable reliance from the contents of the loan documents Machuca signed, and from an unsupported inference that Machuca inserted the contents to induce a lender's reliance. But the bankruptcy court was unpersuaded. It identified the following

---

[5](...continued)
the wake of the subprime lending crisis. In other words, there is a reason why knowledgeable people in the mortgage lending industry cynically referred to these loans as "liar's loans." See note 4, supra.

[6]Actually, this misstates Boyajian's holding. Boyajian held that an assignee's reliance was not necessary to satisfy § 523(a)(2)(B)'s reliance element when the assignee had already established the original lender's reasonable reliance. See id. at 1090. Boyajian did not address the question of whether, and under what circumstances, the assignee's reliance might be sufficient by itself under § 523(a)(2)(B).

The Panel has indicated that an assignee's reliance, under appropriate circumstances and when not contested, can support a finding of reliance under § 523(a)(2)(B)(iii). See Tustin Thrift & Loan Ass'n v. Maldonado (In re Maldonado), 228 B.R. 735, 737–740 (9th Cir. BAP 1999). Given the bankruptcy court's finding that no reasonable person could rely upon the income and other contents of the Application, this case does not present the unaddressed issue of whether an assignee's alleged but contested reliance is sufficient to satisfy § 523(a)(2)(B)(iii). Cf. id. at 737 (such reliance conceded and not contested).

8

as reasons it rejected HPF's argument: (1) HPF presented no competent evidence from which the court could ascertain National City's business practices in making stated income loans; (2) the Application was signed and dated <u>after</u> the date on the promissory note, and just before the loan closed; and (3) "red flags" — that is, facts which would require a reasonable person to investigate further before making the loan — were present, and these red flags should have caused National City to question and investigate Machuca's income representations if National City sufficiently cared about the income representations to constitute reliance. Combined with other arguments, these factors persuaded the bankruptcy court that HPF had failed to carry its summary judgment burden with respect to § 523(a)(2)(B)'s reliance element.

As the bankruptcy court put it, HPF had not presented any evidence from which the court reasonably could infer National City's reasonable reliance on Machuca's income representations. Moreover, the court stated that no lender could have reasonably relied upon the Application and the other evidence in the record, given the numerous red flags contained in those documents. Accordingly, the bankruptcy court granted Machuca's summary judgment motion, and entered its order confirming that grant on December 19, 2011.[7] HPF did not appeal that order, nor

[7]The bankruptcy court also stated that it was going to sustain Machuca's evidentiary objections to both Ganter's declaration and Schuerman's declaration. We could not, however, find these objections in the record. Nonetheless, the propriety of the bankruptcy court's evidentiary rulings is not at issue in this appeal. For purposes of determining whether the bankruptcy
(continued...)

9

has it challenged it under Rule 9024.

Machuca then filed a motion to recover his attorneys' fees under § 523(d). HPF opposed, arguing that its filing and prosecution of the adversary proceeding was substantially justified, as it had a reasonable basis in both law and fact for its position.

Relying on its then-final summary judgment order, the bankruptcy court rejected HPF's substantial justification argument. More specifically, the court focused on the complete absence of competent evidence that could support an inference of reasonable reliance. According to the bankruptcy court, this absence of evidence established that HPF did not have a reasonable basis in law and fact for its defense of the summary judgment motion. As the court explained:

> The law is straightforward: You need reasonable reliance by National City. Yet despite this clear requirement, no admissible facts of any kind were presented, no personal knowledge offered by any personal — was again, was offered to establish reasonable reliance. This is not surprising given the fact that stated income loans were magnets for misrepresentations and a convenient excuse by lenders to bypass even the most rudimentary attempt at due diligence of the borrower's income, all in an effort to make the loan and sell it on the secondary market.

Hr'g Trans. (Jan. 24, 2012) at 8:7-16.

The bankruptcy court entered an order on January 26, 2012,

[7](...continued)
court erred in finding that HPF lacked substantial justification for its position, we can and will consider the contents of both declarations, even though the bankruptcy court considered them inadmissable for purposes of the summary judgment motion. See First Card v. Hunt (In re Hunt), 238 F.3d 1098, 1103 (9th Cir. 2001) (stating that a finding regarding substantial justification "need not be based solely on the admissible evidence before the court").

10

granting Machuca's fee motion.  HPF timely filed a notice of appeal on February 7, 2012.[8]

### III.  LIMITED REVIEW

HPF's February 7, 2012 notice of appeal only refers to the bankruptcy court's January 26, 2012 order granting Machuca's fee motion.  It does not mention the court's December 19, 2011 summary judgment ruling.  Nonetheless, HPF's opening appeal brief suggests that HPF is now seeking appellate review of both the fee order and the summary judgment.  That we cannot do.  An order granting summary judgment on all remaining counts is final for purposes of filing an appeal.  Key Bar Invs., Inc. v. Cahn (In re Cahn), 188 B.R. 627, 630 (9th Cir. BAP 1995).[9]  HPF's election not to appeal the bankruptcy court's summary judgment ruling means that the summary judgment order is now final, and cannot be collaterally attacked.

Accordingly, the scope of our review in this appeal is limited to the bankruptcy court's fee order.

### IV.  APPLICATION OF § 523(d)

HPF's appeal challenges the bankruptcy court's substantial

---

[8]The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(I) and (O).  We have jurisdiction under 28 U.S.C. § 158, subject to the jurisdictional issue discussed below.

[9]The pendency of Machuca's fee motion did not toll the time to appeal the summary judgment ruling.  It was a collateral matter to the disposition of the adversary proceeding; see Rule 8002(b).  See also Lindblade v. Knupfer (In re Dyer), 322 F.3d 1178, 1186 (9th Cir. 2003) ("[W]e have held that unresolved issues related to attorneys' fees do not defeat finality, regardless of whether the attorneys' fees are available under a statute, by contract, or as a sanction for bad faith litigation.").

11

justification ruling. "Substantial justification" has a long history, and one not wholly within the Bankruptcy Code. We thus begin our analysis with a review of the origins and purpose of § 523(d)'s substantial justification standard.

A. Statutory Development of § 523(d)

Prior to 1984, § 523(d) did not contain a substantial justification standard for awarding attorneys' fees. Rather, it contained an explicit shifting of fees in favor of the consumer debtor, unless such a shift was "clearly inequitable."[10] The purpose of § 523(d) as originally drafted was to deter groundless nondischargeability actions brought primarily to coerce settlements from honest debtors who couldn't effectively fight back. See S. Rep. No. 95-989 at 80 (1978).

When Congress enacted the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. 98-353, § 307(b), 98 Stat. 333 ("BAFJA"), however, it cut back on this broad grant. It replaced the "clearly inequitable" standard with a standard that allowed attorneys' fees under § 523(d) only if the creditor's position was not "substantially justified."

This standard was not created out of whole cloth. Congress borrowed it from the Equal Access to Justice Act ("EAJA"). See

---

[10]Before 1984, § 523(d) read as follows:

If a creditor requests a determination of dischargeability of a consumer debt under subsection (a)(2) of this section, and such debt is discharged, the court shall grant judgment against such creditor and in favor of the debtor for the costs of, and a reasonable attorney's fee for, the proceeding to determine dischargeability, unless such granting of judgment would be clearly inequitable.

12

First Card v. Hunt (In re Hunt), 238 F.3d 1098, 1103 (9th Cir. 2001) (citing First Card v. Carolan (In re Carolan), 204 B.R. 980, 987 (9th Cir. BAP 1996)).  In adopting this different, more creditor-friendly, standard, Congress wished to shift incentives so that creditors would not be unduly discouraged from pursuing well-founded nondischargeability actions.  As Congress put it:

> The original congressional intent in the drafting S. 523(d) of the existing Bankruptcy Code was to discourage frivolous objections to discharge of consumer debts, but not to discourage well-founded objections by honest creditors.  The language of the subsection, however, makes the award of the debtor's costs and attorney's fees virtually mandatory in an unsuccessful challenge of a consumer debt.  It has been interpreted as requiring the award of fees and costs even when the creditor acted in good faith.  CF., In re Majewski, 7 B.R. 904 (Bd. D. Conn. 1981).  The net effect of this provision has been to preclude creditors from objecting to discharge of any consumer debt unless they are certain that the court will sustain the objection.
>
> The Committee, after due consideration, has concluded that amendment of this provision to incorporate the standard for award of attorney's fees contained in the Equal Access to Justice Act strikes the appropriate balance between protecting the debtor from unreasonable challenges to dischargeability of debts and not deterring creditors from making challenges when it is reasonable to do so.  This standard provides that the court shall award attorney's fees to a prevailing debtor where the court finds that the creditor was not substantially justified in challenging the dischargeability of the debt, unless special circumstances would make such an award unjust.

S. Rep. No. 98-65, at 9-10 (1983).[11]

///

[11]Senate Report 98-65 accompanied a predecessor bill that ultimately led to the enactment of BAFJA.  That predecessor bill, commonly known as the Omnibus Bankruptcy Improvements Act of 1983 ("OBIA"), contained proposed amendments to § 523(d)'s attorneys' fees provision identical to those contained in BAFJA.  See OBIA, S. 445, 98th Cong. § 209(b) (1983).

13

B.   Application of the Substantial Justification Standard to HPF

To support a request for attorneys' fees under § 523(d), a debtor initially needs to prove: (1) that the creditor sought to except a debt from discharge under § 523(a), (2) that the subject debt was a consumer debt, and (3) that the subject debt ultimately was discharged. Stine v. Flynn (In re Stine), 254 B.R. 244, 249 (9th Cir. BAP 2000). "Once the debtor establishes these elements, the burden shifts to the creditor to prove that its actions were substantially justified." Id.; see also In re Hunt, 238 F.3d at 1103 (citing In re Carolan, 204 B.R. at 987, and holding that "the creditor bears the burden of proving that its position is substantially justified").

To satisfy the substantial justification standard, HPF needed to demonstrate that it had a reasonable factual and legal basis for its claim. See In re Hunt, 238 F.3d at 1103 (citing Pierce v. Underwood, 487 U.S. 552, 565 (1988)). As stated in the legislative history, and mirrored in subsequent cases:

> To avoid a fee award [under § 523(d)], the creditor must show that its challenge had a reasonable basis both in law and in fact. The requirement that the creditor must show that it was substantially justified to avoid a fee award is necessary because it is far easier for the creditor to demonstrate the reasonableness of its action than it is for the debtor to marshal the facts to prove that the creditor was unreasonable.

S. Rep. No. 98-65 at 59.

1.   The Relationship Between Summary Judgment and Substantial Justification

Substantial justification is thus a higher standard than that used to determine whether litigation is frivolous. Pierce,

14

487 U.S. at 566 (interpreting EAJA). Although frivolous litigation is never substantially justified, under EAJA some nonfrivolous litigation also fails the test. The issue often arises when a creditor loses an action otherwise filed in good faith by summary judgment, directed verdict, or a judgment on the pleadings. In such cases, the bankruptcy court must scrutinize the merits of the action with particular care, as these types of outcomes often suggest a lack of substantial justification. See Keasler v. United States, 766 F.2d 1227, 1231 (8th Cir. 1985) (interpreting EAJA); see also F.J. Vollmer Co. v. Magaw, 102 F.3d 591, 595 (D.C. Cir. 1996) ("In some cases, the standard of review on the merits is so close to the reasonableness standard applicable to determining substantial justification that a losing agency is unlikely to be able to show that its position was substantially justified.").

But not all such losses lead to fee-shifting. There is no presumption of a lack of substantial justification just because a debtor prevailed on summary judgment. As this Panel has said on prior occasions, the substantial justification requirement "should not be read to raise a presumption that the creditor was not substantially justified simply because it lost." In re Carolan, 204 B.R. at 987; see also Hill v. INS (In re Hill), 775 F.2d 1037, 1042 (9th Cir. 1985); S. Rep. No. 98-65 at 59 ("The standard, however, should not be read to raise a presumption that the creditor was not substantially justified, simply because it lost the challenge.").

For instance, a novel but reasonable legal theory in support of its opposition to Machuca's summary judgment motion

15

might have served as a basis for concluding that HPF's opposition was substantially justified. See Renee v. Duncan, 686 F.3d 1002, 1017-18 (9th Cir. 2012) (interpreting EAJA and citing Timms v. United States, 742 F.2d 489, 492 (9th Cir. 1984)). So too might have a legal theory subject to a split of non-binding authority when there is no case on point. See Mattson v. Bowen, 824 F.2d 655, 656-57 (8th Cir. 1987) (also interpreting EAJA).

HPF asserts none of these justifications. Instead, it defends on the record the bankruptcy court used to grant summary judgment against it. In particular, it asserts that it was substantially justified in its position on reliance under § 523(a)(2)(B)(iii).

In so doing, it burdened itself with an almost insurmountable task. HPF did not appeal the summary judgment ruling and must contend with the issue preclusive effect of that judgment. See Steen v. John Hancock Mut. Life Ins. Co., 106 F.3d 904, 912 (9th Cir. 1997) ("The determination of an issue on a motion for judgment on the pleadings or a motion for summary judgment is sufficient to satisfy the 'litigated' requirement for collateral estoppel.") (citing Restatement (Second) of Judgments § 27 cmt. d (1982); and Papadakis v. Zelis (In re Zelis), 66 F.3d 205, 208 (9th Cir. 1995)).

As noted above, the bankruptcy court's order granting summary judgment was final. HPF cannot collaterally attack that judgment through the § 523(d) proceeding. At most, after the appeal time had run, it might have sought relief under Rule 9024 (incorporating Federal Rule of Civil Procedure 60(b)). See 18B

16

Charles Alan Wright et al., FEDERAL PRACTICE AND PROCEDURE § 4478 (2d ed. 2012) ("After final judgment, direct relief from the judgment is governed by the rules governing direct and collateral attack—principally found in Civil Rule 60(b) . . . .").

But HPF neither appealed nor sought relief under Rule 9024. In the face of such inaction, this Panel must take the grant of the summary judgment at its face value: HPF's complaint and response to the summary judgment motion presented no genuine issue of material fact regarding reliance under § 523(a)(2)(B)(iii). See In re Hunt, 238 F.3d at 1102 n.5 (failure to appeal merits decision meant that creditor waived "any right to challenge the evidentiary rulings that led to it" in subsequent proceeding seeking attorneys' fees under § 523(d)). In short, the doctrine of issue preclusion estops HPF from arguing that the bankruptcy court was wrong, or that HPF had an undisclosed basis in law and fact for its reliance claim. Id.; Steen, 106 F.3d at 912. As a consequence, HPF cannot argue that it had a reasonable factual and legal basis for its fraud claim. See In re Hunt, 238 F.3d at 1103. Its position was thus not substantially justified.

     2. Substantial Justification, Abuse of Discretion, and the Record on Reasonable Reliance

Even if HPF could surmount its issue preclusion hurdle, it would then face another virtually insuperable hurdle: the abuse of discretion standard. This circuit has specifically held that § 523(d) orders are subject to the abuse of discretion appellate review standard. In re Hunt, 238 F.3d at 1101.

17

Under this highly deferential standard of review, we first "determine de novo whether the [bankruptcy] court identified the correct legal rule to apply to the relief requested." United States v. Hinkson, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc). And if the bankruptcy court identified the correct legal rule, we then determine under the clearly erroneous standard whether its factual findings and its application of the facts to the relevant law were: "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." Id. (internal quotation marks omitted).

In order to apply the first part of this standard – whether the bankruptcy court used the correct legal rule – we examine the bankruptcy court's ruling on Machuca's summary judgment motion. This in turn requires us to consider its treatment of § 523(a)(2)(B)'s reliance element, on which the summary judgment motion hinged.

Reasonable reliance is not defined in the Bankruptcy Code; to ascertain whether it exists, the bankruptcy court must employ a "prudent person" test. Cashco Fin. Servs., Inc. v. McGee (In re McGee), 359 B.R. 764, 774 (9th Cir. BAP 2006). Under the prudent person test, the bankruptcy court must objectively assess whether the creditor exercised the same degree of care expected from a reasonably prudent person entering into the same type of business transaction under similar circumstances. See First Mut. Sales Fin. v. Cacciatori (In re Cacciatori), 465 B.R. 545, 555 (Bankr. C.D. Cal. 2012); see also Gertsch v. Johnson & Johnson, Fin. Corp. (In re Gertsch), 237 B.R. 160, 170 (9th Cir. BAP 1999). Bankruptcy courts must make this assessment on a

18

case-by-case basis in light of the totality of the circumstances. See In re McGee, 359 B.R. at 774; In re Gertsch, 237 B.R. at 170.

Against this background, it is standard learning that a creditor cannot simply ignore red flags that directly call into question the truth of the statements on which the creditor claims to have relied. See In re McGee, 359 B.R. at 775. Under such circumstances, the creditor must support its reasonable reliance claim with evidence explaining why it was reasonable for it to rely on the statements notwithstanding the red flags. Id. As the bankruptcy court used this standard, it "identified the correct legal rule." Hinkson, 585 F.3d at 1262.

It also applied that legal rule correctly. In response to the summary judgment, HPF argued that a trier of fact reasonably could infer reasonable reliance from: (1) the language of the Application; (2) Ganter's self-serving statement that HPF and National City had relied on Machuca's income representation; and (3) Schuerman's statement that mortgage lenders and the secondary mortgage market typically rely on income representations. But HPF's evidence does not contradict the fact that it and its witnesses ignored the red flags associated with the Loan. HPF's response to the summary judgment motion simply failed to account in any meaningful way for the impact those red flags necessarily would have had on a hypothetical prudent person's assessment of whether any reliance should be placed on Machuca's income representation.

Against this background, it was not illogical, implausible or without adequate support in the record, Hinkson, 585 F.3d at

19

1262, to determine that neither HPF nor National City reasonably could have relied on Machuca's income representation given the many "red flags." These red flags included: (1) the income discrepancies between the Application and the Unsigned Application; (2) the implausible amount of base employment income claimed by a five-year state corrections officer; (3) the last-minute signing of the Application, just before funding of the Loan and after the date of the promissory note; (4) National City's approval and funding of the Loan without income verification; and (5) HPF's purchase of the loan without income verification.

As the Supreme Court has advised:

> When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

Scott v. Harris, 550 U.S. 372, 380 (2007).

Here, HPF claimed that both it and National City reasonably relied on Machuca's income representation, but the undisputed facts in the record regarding the red flags associated with the Loan wholly undermined HPF's reasonable reliance claims. In the parlance of Scott, HPF's "version of events is so utterly discredited by the record that no reasonable jury could have believed" it. Id.[12]

---

[12]Scott acknowledged that, in the summary judgment context, the district court had to "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" Id. at 378 (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)). Nonetheless, Scott held that "the light most favorable" to the
(continued...)

20

In sum, given the undisputed facts before the bankruptcy court undermining HPF's reasonable reliance claims, no trier of fact reasonably could have found § 523(a)(2)(B)'s reliance element satisfied. With the correct legal rule applied, and an application of the facts to that rule supported by logical, plausible and supportable inferences from the record, there was no abuse of discretion in finding a lack of substantial justification for HPF's position.

## V. CONCLUSION

For all of the reasons set forth above, we AFFIRM the order granting Machuca's fee motion.

---

[12](...continued) opposing party did not include ignoring the reality of undisputed facts in the record.

21