FILED

MAR 26 2014

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: ) | BAP No.   CC-13-1370-KuPaTa |
| ) | |
| ROARK MONTGOMERY MERRILL, ) | Bk. No.   11-52820 |
| ) | |
| Debtor. ) | Adv. No.   12-01111 |
| _____ ) | |
| ) | |
| PATRIC J. KELLY; EDWARD ) | |
| ROUPINIAN; ARLENE ROUPINIAN, ) | |
| ) | |
| Appellants, ) | |
| ) | |
| v. ) | **MEMORANDUM**[*] |
| ) | |
| ROARK MONTGOMERY MERRILL, ) | |
| ) | |
| Appellee. ) | |
| _____ ) | |

Argued and Submitted on February 20, 2014
at Pasadena, California

Filed – March 26, 2014

Appeal from the United States Bankruptcy Court
for the Central District of California

Honorable Gregg W. Zive, Bankruptcy Judge, Presiding

_____

Appearances:     Robert Schachter of Hitchcock, Bowman & Schachter
                 argued for appellants Patric J. Kelly, Edward
                 Roupinian and Arlene Roupinian; David Brian Lally
                 argued for appellee Roark Montgomery Merrill.

_____

Before: KURTZ, PAPPAS and TAYLOR, Bankruptcy Judges.

_____

[*]This disposition is not appropriate for publication.
Although it may be cited for whatever persuasive value it may
have (see Fed. R. App. P. 32.1), it has no precedential value.
See 9th Cir. BAP Rule 8013-1.

**INTRODUCTION**

Patric J. Kelly, Edward Roupinian and Arlene Roupinian (collectively, "Lenders") obtained a state court judgment against Roark Montgomery Merrill for roughly $160,000 based on Merrill's personal guaranty of a third party's debt. After Merrill filed bankuptcy, the Lenders commenced an adversary proceeding seeking to except the judgment debt from discharge under 11 U.S.C. § 523(a)(2)(B).[1] After trial, the bankruptcy court entered judgment in favor of Merrill and against the Lenders. The bankruptcy court held that it would not except the judgment debt from discharge because any reliance by the Lenders in Merrill's written financial representations was unreasonable. The Lenders filed this appeal.

We cannot conclude on the record before us that the bankruptcy court's ultimate finding of no reasonable reliance was illogical, implausible or without support in the record. In addition, even though the bankruptcy court did not make an explicit finding on the Lenders' actual reliance, based on the entire record, and especially on the court's comments after trial, we are convinced that the bankruptcy court implicitly found that the Lenders did not actually rely on Merrill's financial representations before entering into the underlying lending transaction.

Because the bankruptcy court's reasonable reliance and actual reliance findings were not clearly erroneous, we AFFIRM

---

[1]Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.

its decision declaring the judgment debt dischargeable.

**FACTS**

The Lenders from time to time lent money to third parties through a company known as California Western Financial Investments Inc. ("Cal. Western"). Cal. Western was a mortgage brokerage firm that would find individual investors, like the Lenders, willing to fund real estate secured loans for individual borrowers.

In 2006, Cal. Western arranged for the Lenders to make a "hard money loan"[2] to Daniel and Sandra Levy in the principal amount of $254,600, to fund the construction of a residence on vacant land located in San Jacinto, California. Before making the loan, the Lenders insisted on receiving a guaranty of the Levys' loan obligations from Merrill. Apparently, Cal. Western advised the Lenders that Merrill had a financial stake in the land and its development and that he would be willing execute a guaranty in order to induce the Lenders to make the loan to the Levys.

The record is quite thin regarding what documents the Lenders received and reviewed in advance of funding the Levy loan. In fact, the sole document the Lenders testified to

---

[2]One bankruptcy court has described a "hard money loan" as a loan "too risky to meet the criteria of a bank or other conventional lender, typically involving loan fees and interest rates substantially higher than those charged by conventional lenders." Rigby v. Mastro (In re Mastro), 465 B.R. 576, 585 (Bankr. W.D. Wash. 2011). It also has been said that hard money lenders specialize "in short term real estate bridge loans to borrowers who are unable to access conventional financing due to creditworthiness and other high risk factors." In re WN Truck Stop, L.L.C., 2011 WL 65928 (Bankr. N.D. Tex. 2011).

3

receiving from Merrill in advance of funding the loan was a form loan application containing Merrill's financial information. It is undisputed that the Lenders "requested and required" Merrill to submit the loan application. Joint Pretrial Order and Stipulation (June 18, 2013) at p. 3. But it also is undisputed that the Lenders only received an unsigned and undated version of that application.

It is less than clear what the Lenders did with Merrill's loan application once they received it. Two of the Lenders, Kelly and Roupinian,[3] testified at trial. Their direct testimony was presented by declaration. They both stated in their trial declarations, in a conclusory manner, that they relied on Merrill's loan application and that the financial information in the loan application was an "important fact" they considered before making the loan. Kelly Decl. (Aug. 2, 2013) at ¶¶ 36, 37, 43; Roupinian Decl. (Aug. 2, 2013) at ¶¶ 35, 36, 42. During redirect examination, Kelly went even further and testified as follows:

Q:   What caused you to finally make the loan?

A:   Mr. Merrill's application.

Q:   And the information provided in his application?

A:   Yes.

Trial Tr. (June 19, 2013) at 140:14-18.

On the other hand, there is no evidence in the record that the Lenders verified any of the information set forth on

---

[3]Our references to "Roupinian" refer solely to Mr. Roupinian. The record indicates that Ms. Roupinian did not actively participate in the trial.

4

Merrill's loan application, such as by obtaining and reviewing a credit report or Merrill's tax returns. This seems odd, given that Kelly was a veteran attorney who had prior experience serving as a foreclosure trustee and who felt comfortable enough with the topic of mortgage loan origination to volunteer his opinion during cross-examination concerning how loan applications typically are prepared and processed. As for Roupinian, he testified to having many years of experience as a mechanical engineer, as an account executive for various brokerage firms, and as a real property investor on behalf of his family trust, including his investment in over thirty loans through Cal. Western.

Notwithstanding their stated reliance on Merrill's financial information in deciding to make the Levy loan, neither Kelly nor Roupinian insisted on receiving a signed and dated version of Merrill's form loan application before they funded the loan. According to Roupinian's testimony, he did not even notice that Merrill's loan application was not signed.

After the Levys defaulted on the loan, the Lenders sued Merrill in the Los Angeles County Superior Court (Case No. NC052256) and, in May 2011, obtained a judgment after trial for $158,511. Merrill never satisfied any portion of the judgment and commenced his chapter 7 bankruptcy case several months later, in October 2011.

In January 2012, the Lenders commenced an adversary proceeding against Merrill seeking to except the judgment debt from discharge under § 523(a)(2)(B), in essence alleging that Merrill's loan application constituted a false written financial

5

statement. In relevant part, the Lenders alleged that the loan application misrepresented the aggregate value of Merrill's real estate assets, the aggregate amount of equity Merrill had in those assets and the amount of monthly income Merrill was earning.

After a one-day bench trial, the bankruptcy court held that the judgment debt was dischargeable. The court found that Merrill's loan application contained knowing and material misrepresentations regarding his financial condition that he made with the intent to deceive in order to induce the Lenders to enter into the loan. The court further found that, as a proximate result of Merrill's misrepresentations, the Lenders incurred damages in the amount of Merrill's judgment debt.

As set forth in the bankruptcy court's findings, Merrill's loan application represented that he had total real estate assets worth nearly $7 million, when in reality his real estate assets were worth only $4.5 million. In light of the stated $3 million in secured debt encumbering his real property, instead of having nearly $4 million in equity, the court explained, Merrill actually had only $1.5 million in equity.

Meanwhile, as for income, the court pointed out that, according to the loan application, Merrill earned $186,265 per month, which would amount to earnings of over $2.2 million per year. However, based on Merrill's testimony and his 2005 tax return, the court found that he in reality was earning closer to $31,000 per month, or $372,000 per year.

None of these findings are challenged on appeal, inasmuch as Merrill did not file a cross-appeal from the bankruptcy court's

6

decision. Instead, the Lenders' appeal focuses on the court's finding that the Lenders did not reasonably rely on the financial information contained in Merrill's loan application.

The bankruptcy court made a number of subsidiary findings regarding the reasonable reliance issue. These subsidiary findings reflect: (1) that the court recognized there was evidence supporting both sides of that issue, (2) that the court weighed the conflicting evidence and (3) that the court chose to give varying weight to its subsidiary findings in making its ultimate finding regarding reasonable reliance.

For instance, there were several subsidiary findings concerning the terms contained in Merrill's guaranty. Some of these terms indicated that the Lenders were not relying on Merrill's financial information while others indicated precisely the opposite. Ultimately, however, the bankruptcy court determined that the guaranty was not a red flag and, while poorly drafted, was on the whole intended to provide the Lenders with additional comfort and assurance that the Levys' loan obligations would be satisfied one way or another. In essence, the bankruptcy court found the guaranty to be more of a red herring than a red flag.

Similarly, the court commented on the overall strangeness of Merrill's involvement in the property and in the loan transaction. The court considered it strange, even suspicious, that, if Merrill really had as much equity and income as his loan application reflected, why would he invest $100,000 in the Levys' property and be willing to sign the guaranty to support the Levys' financing efforts, but at the same time be unwilling or

7

unable to directly loan the Levys the necessary funds to complete the property development? On the one hand, this led the court to state: "[t]hat should have raised some questions about the accuracy of [Merrill's] financial information." Findings of Fact and Conclusions of Law After Trial (July 22, 2013) at 6:21-22. On the other hand, the court also stated that the overall strangeness of Merrill's involvement in the transaction was not a red flag and did not create any duty for the Lenders to investigate before they could reasonably rely on Merrill's financial information. Ultimately, the bankruptcy court's reasonable reliance finding did not hinge on this factor.

Instead, in finding no reasonable reliance, the court focused on three things: (1) on the fact that Merrill's loan application was unsigned and undated; (2) on the fact that Merrill inflated the value of his real property assets by roughly $2.5 million; and (3) on the fact that his stated income was obviously false, especially in light of the size of the investment at issue. According to the court, these three facts were red flags that should have led the lenders to conduct at least some inquiry into Merrill's financial information. One thing the lenders easily could have done, the court noted, was obtain and review Merrill's 2005 tax return. If they had done so, the court further noted, they would have discovered that the net income reported on the tax return was a small fraction of what Merrill had stated in his loan application.

As the bankruptcy court put it, the Lenders did not offer any evidence that they did anything to attempt to verify Merrill's true financial condition and instead chose to accept

8

Merrill's loan application on its face. Given the red flags and the complete absence of any investigation into Merrill's financial representations, the court reasoned, the Lenders had failed to meet their burden of proof to establish that they had reasonably relied on Merrill's loan application.

On July 22, 2013, the bankruptcy court entered its judgment declaring the judgment debt dischargeable, and on August 2, 2013, the Lenders timely appealed.

**JURISDICTION**

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(I). We have jurisdiction under 28 U.S.C. § 158.

**ISSUE**

Did the bankruptcy court err when it declared Merrill's judgment debt dischargeable?

**STANDARDS OF REVIEW**

In nondischargeability appeals, we review the bankruptcy court's fact findings under the clearly erroneous standard and its legal conclusions de novo. Oney v. Weinberg (In re Weinberg), 410 B.R. 19, 28 (9th Cir. BAP 2009), aff'd, 407 Fed.Appx. 176 (9th Cir. 2010). In addition, we review de novo "mixed questions" of fact and law that require consideration of legal concepts and the exercise of judgment about the values that animate governing legal principles. Id.

Whether the Lenders reasonably relied on Merrill's financial information is a question of fact subject to the clearly erroneous standard. Siriani v. Nw. Nat'l Ins. Co. (In re Siriani), 967 F.2d 302, 307 (9th Cir. 1992); Gosney v. Law

9

(In re Gosney), 205 B.R. 418, 421 (9th Cir. BAP 1996).  A finding of fact is clearly erroneous if it is "illogical, implausible, or without support in the record."  Retz v. Samson (In re Retz), 606 F.3d 1189, 1196 (9th Cir. 2010).  We may not reverse simply because we would have decided the factual issue differently.  See Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573 (1985).  And when a finding of fact is based on credibility determinations, we must give even greater deference to the bankruptcy court's finding, because the bankruptcy court as the trier of fact is in the best position to assess the credibility of witnesses.  See id. at 575.

We can affirm on any ground supported by the record. See Black v. Bonnie Springs Family Ltd. P'ship (In re Black), 487 B.R. 202, 211 (9th Cir. BAP 2013) (citing Shanks v. Dressel, 540 F.3d 1082, 1086 (9th Cir. 2008)).

**DISCUSSION**

To prevail on their § 523(a)(2)(B) claim, the Lenders needed to establish by a preponderance of evidence each of the following elements:

(1) a representation of fact by the debtor,

(2) that was material,

(3) that the debtor knew at the time to be false,

(4) that the debtor made with the intention of deceiving the creditor,

(5) upon which the creditor relied,

(6) that the creditor's reliance was reasonable, [and]

(7) that damage proximately resulted from the representation.

Cashco Fin. Servs., Inc. v. McGee (In re McGee), 359 B.R.

10

764, 772 (9th Cir. BAP 2006) (quoting Candland v. Ins. Co. of N. Am. (In re Candland), 90 F.3d 1466, 1469 (9th Cir. 1996)); see also In re Siriani, 967 F.2d at 304.

Here, the bankruptcy court's decision hinged on its finding that the Lenders did not prove the reasonable reliance element. As this Panel recently stated, reasonable reliance is determined "on a case-by-case basis in light of the totality of the circumstances." Heritage Pac. Fin., LLC v. Machuca (In re Machuca), 483 B.R. 726, 736 (9th Cir. BAP 2012) (citations omitted). And a "prudent person test" is used to make the reasonable reliance assessment. Id. That test requires the bankruptcy court to examine "whether the creditor exercised the same degree of care expected from a reasonably prudent person entering into the same type of business transaction under similar circumstances." Id.

At the same time, the Ninth Circuit Court of Appeals has been reluctant to impose a fixed duty to investigate on lenders as a prerequisite to their reasonably relying on a borrower's financial representations. See In re Candland, 90 F.3d at 1471; Lansford v. La Trattoria, Inc. (In re Lansford), 822 F.2d 902, 904 (9th Cir. 1987). And this Panel similarly has been reluctant to impose such a duty to investigate on defrauded creditors. See Gertsch v. Johnson & Johnson, Fin. Corp. (In re Gertsch), 237 B.R. 160, 170 (9th Cir. BAP 1999) ("[A]lthough a creditor is not entitled to rely upon an obviously false representation of the debtor, this does not require him or her to view each representation with incredulity requiring verification.").

As for red flags, we have been careful to avoid broadly

11

calling any transaction peculiarity a red flag, so as to not inadvertently impose an investigation standard beyond that which the Ninth Circuit might require. See In re Gertsch, 237 B.R. at 170-71.

With these legal principles in mind, we turn to the Lenders' argument on appeal that the bankruptcy court committed reversible error when it found no reasonable reliance. In essence, the Lenders contend that the "red flags" the bankruptcy court found were not really red flags; they were not obviously false misrepresentations regarding Merrill's financial condition, nor did these so-called red flags demonstrate that Merrill's financial statement was inherently unreliable. As a result, the Lenders reason, they had no duty to verify Merrill's financial information before they could rely on it.

There are at least two significant flaws in the Lenders' argument. First, it places undue emphasis on the bankruptcy court's red flag findings and improperly de-emphasizes the larger question of whether, under the totality of circumstances, a reasonably prudent lender facing similar circumstances would have funded the Levy loan without doing anything to attempt to verify Merrill's financial information. And second, it does not reference, let alone address, the appropriate standard of review we must apply: the clearly erroneous standard of review.[4]

The real question the Lenders have asked us to decide is

[4]In their opening appeal brief, the Lenders twice conceded that reasonable reliance is a question of fact, but also twice misstated the applicable standard of review as the abuse of discretion standard.

12

whether the bankruptcy court clearly erred when it found that, under all of the facts and circumstances presented, a reasonably prudent lender would have made at least some effort to verify Merrill's financial information.[5] And, under the clearly erroneous standard of review, we could not overturn this finding unless it was illogical, implausible, or without support in the record. See In re Retz, 606 F.3d at 1196.

This is the onerous appellate burden the Lenders needed to satisfy. The Lenders attempted to meet this burden by pointing to Smith v. Lachter (In re Smith), 242 B.R. 694, 702 (9th Cir. BAP 1999) as an example of an appeal in which this Panel upheld the bankruptcy court's reasonable reliance finding under somewhat similar circumstances. See id. But there is a critical distinction between In re Smith and the appeal currently before us. Unlike here, the bankruptcy court in In re Smith found that the plaintiff reasonably relied on the debtor's financial information. As such, to the extent In re Smith is pertinent to our resolution of this appeal, it stands for the proposition that this Panel will not reverse a bankruptcy court's finding of reasonable reliance if it is "plausible and supported by substantial evidence." Id. As In re Smith also put it: "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Id. at 700.

---

[5] The Lenders have not contested on appeal the bankruptcy court's finding that they did nothing to verify Merrill's financial information.

13

*Accord*, *Anderson*, 470 U.S. at 574.[6]

In this case, while we may or may not agree with each and every subsidiary finding the bankruptcy court made, there was still sufficient evidence in the record to support the bankruptcy court's ultimate finding of no reasonable reliance and, on the whole, that finding was not illogical or implausible. In the parlance of *Anderson*, having reviewed the "entire evidence," we are not "left with the definite and firm conviction that a mistake has been committed" regarding the bankruptcy court's ultimate finding of no reasonable reliance. *Id.* at 573 (citing *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

Put another way, any error the bankruptcy court might have made in its red flag findings was harmless error. And we must ignore harmless error. *See* *Van Zandt v. Mbunda (In re Mbunda)*, 484 B.R. 344, 355 (9th Cir. BAP 2012).

More importantly, even if we were to hold that the bankruptcy court's no reasonable reliance finding was clearly erroneous, we would nonetheless affirm the bankruptcy court's decision on an alternate ground. Having reviewed the entire record and all of the court's findings and conclusions, we are convinced that the bankruptcy court also found that the Lenders did not actually rely on Merrill's financial information.

---

[6]At oral argument, the Lenders also referenced the following unpublished BAP decisions that reached the same result as *In re Smith*: *Tovar v. Heritage Pac. Fin., LLC (In re Tovar)*, 2012 WL 3205252 (9th Cir. BAP 2012); and *Kempf v. Hitachi Capital Am. Corp. (In re Kempf)*, 2012 WL 603805 (9th Cir. BAP 2012). For the same reason we find that *In re Smith* does not support the Lenders' position on appeal, we also find *In re Tovar* and *In re Kempf* do not support that position.

14

As an appellate court, we must construe the bankruptcy court's findings of fact favorably, such that any doubt as to what the bankruptcy court meant is resolved in favor of upholding rather than invalidating the bankruptcy court's judgment. See Brock v. Big Bear Market No. 3, 825 F.2d 1381, 1384 (9th Cir. 1987)(citing Wells Benz, Inc. v. United States ex rel. Mercury Elec. Co., 333 F.2d 89, 92 (9th Cir. 1964)). As a result, "whenever, from facts found, other facts may be inferred which will support the judgment, such inferences will be deemed to have been drawn." Id. Accord, Caterino v. United States, 794 F.2d 1, 6 n.2 (1st Cir. 1986); Grover Hill Grain Co. v. Baughman-Oster, Inc., 728 F.2d 784, 793 (6th Cir. 1984); Brown v. Lykes Bros. S.S. Co., Inc., 484 F.2d 61, 62 n.4 (5th Cir. 1973); Triangle Conduit & Cable Co. v. Federal Trade Commission, 168 F.2d 175, 179 (7th Cir. 1948), aff'd sub nom., Clayton Mark & Co. v. Federal Trade Commission, 336 U.S. 956 (1949); Clyde Equipment Co. v. Fiorito, 16 F.2d 106, 107 (9th Cir. 1926).

While the bankruptcy court here did not make an explicit finding concerning the Lenders' actual reliance, it did state as follows:

> And I think what happened here is that -- the paperwork being done, they fund the loan, and they're comfortable with that. But when the transaction goes sour, then everybody begins to take a hard look at the documents they paid little or no attention to when they entered into the transaction.

Tr. Trans. (June 20, 2013) at 20:11-16. Taking into consideration all of the court's other findings, and the entirety of the record, we construe this statement as an implicit finding that the Lenders did not actually rely on Merrill's financial

15

information.

As explained in In re Siriani, 967 F.2d at 304, and In re McGee, 359 B.R. at 772, actual reliance is a separate and independent element that a creditor must plead and prove to support its § 523(a)(2)(B) claim. And as this Panel recently opined, there can be no reasonable reliance unless the creditor first proves actual reliance. See Heritage Pac. Fin., LLC v. Montano (In re Montano), 501 B.R. 96, 115 (9th Cir. BAP 2013).

Importantly, whereas reasonable reliance is determined under an objective standard and focuses on what a hypothetical prudent person would do under similar circumstances, see In re Machuca, 483 B.R. at 736-37, the actual reliance inquiry necessarily is subjective and focuses on the state of mind of the creditor – what he or she actually considered to be important in deciding to enter into the transaction in which the misrepresentation occurred. See AT&T Universal Card Servs. v. Mercer (In re Mercer), 246 F.3d 391, 412-13 & n.24 (5th Cir. 2001) (indicating that actual reliance inquiry focuses on whether misrepresentation was a substantial factor in influencing the creditor to act); RESTATEMENT (SECOND) OF TORTS §§ 537, 546 (same).

In this case, all of the circumstances the bankruptcy court considered in rendering its reasonable reliance finding, other than its red flag findings, were sufficient to support a finding of no actual reliance. In other words, under the specific circumstances of this case, the absence here of any activity by the Lenders upon receipt of Merrill's unsigned and undated loan application, other than their funding of the Levy loan, was sufficient to support the reasonable inference that the Lenders'

16

did not actually consider Merrill's financial information important to their lending decision.

We acknowledge the existence of conflicting evidence. Specifically, two of the Lenders, Kelly and Roupinian, testified that Merrill's financial information was important to them in making their decision to fund the Levy loan and that they relied on Merrill's financial information. But this testimony was both conclusory and self-serving. Moreover, the above-quoted statement of the bankruptcy court regarding what it thought really happened indicates that the court did not find the Lenders' testimony credible on this point. On this record, neither the court's credibility finding nor its actual reliance finding were clearly erroneous.

**CONCLUSION**

For the reasons set forth above, we AFFIRM the bankruptcy court's judgment declaring Merrill's judgment debt dischargeable.

17