**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY APPELLATE PANEL**

**OF THE NINTH CIRCUIT**

| | |
|---|---|
| In re: | ) BAP No. CC-13-1382-PaKuBl |
| | )        CC-13-1503-PaKuBl |
| STEVE BARLAAM, | )        (Cross Appeals) |
| | )        CC-13-1500-PaKuBl |
|        Debtor. | )        (Related Appeal) |
| _____ ) | |
| | ) Bankr. No. 11-13387-GM |
| STEVE BARLAAM, | ) |
| | ) Adv. Proc. 11-01402-GM |
|        Appellant/Cross-Appellee, | ) |
| | ) |
| v. | ) **M E M O R A N D U M**[1] |
| | ) |
| FINANCIAL SERVICES VEHICLE TRUST, | ) |
| BY AND THROUGH ITS SERVICER, BMW | ) |
| FINANCIAL SERVICES NA, LLC, | ) |
| | ) |
|        Appellee/Cross-Appellant. | ) |
| _____ ) | |
| | ) |
| FINANCIAL SERVICES VEHICLE TRUST, | ) |
| BY AND THROUGH ITS SERVICER, BMW | ) |
| FINANCIAL SERVICES NA, LLC, | ) |
| | ) |
|        Appellant, | ) |
| | ) |
| v. | ) |
| | ) |
| STEVE BARLAAM, | ) |
| | ) |
|        Appellee, | ) |
| _____ ) | |

Argued and Submitted on June 26, 2014,
at Pasadena, California

Filed - July 11, 2014

Appeal from the United States Bankruptcy Court
for the Central District of California

_____

[1] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

-1-

Honorable Geraldine Mund, Bankruptcy Judge, Presiding

Appearances:    Deborah Young of Ayayo Law Offices argued for Steve Barlaam; Rebecca A. Caley of Caley & Associates argued for Financial Services Vehicle Trust.

Before: PAPPAS, KURTZ and BLUMENSTIEL,[2] Bankruptcy Judges.

In BAP No. CC-11-1382, chapter 7[3] debtor Steve Barlaam ("Barlaam") appeals the judgment ("Judgment") of the bankruptcy court declaring that his debts to Financial Services Vehicle Trust, by and through its servicer, BMW Financial Services NA, LLC ("BMW FS") are excepted from discharge under § 523(a)(2)(B). In BAP No. CC-11-1503, BMW FS cross-appeals that portion of the Judgment denying its request for an award of attorney's fees and costs. In BAP No. 11-1500, BMW FS appeals the order ("Order") of the bankruptcy court denying its Motion to Amend the Judgment to Include Attorney's Fees.

We AFFIRM that part of the Judgment declaring that Barlaam's debts to BMW FS are excepted from discharge. However, we REVERSE the bankruptcy court's Judgment and Order denying BMW FS' request for attorney's fees and costs.[4]

---

[2] Hon. Hannah L. Blumenstiel, U.S. Bankruptcy Judge for the Northern District of California, sitting by designation.

[3] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532 and all Rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

[4] While there are three appeals, under the circumstances, we have elected to dispose of the issues and appeals in this single Memorandum.

# FACTS

## Background

Barlaam had a penchant for high-priced automobiles. Between 2004 and 2010, he leased or purchased nine luxury cars and, with the exception of the two involved in this appeal, paid in full or satisfied the lease payment terms for all of them. As was his practice, Barlaam was assisted in his acquisition of the automobiles involved here by his personal assistant, Dan Ruderman ("Ruderman"). When Barlaam wanted a new vehicle, he instructed Ruderman to research cars and dealerships and, if he found a likely candidate, negotiate a deal for Barlaam. Again, with the exception of the two cars in these appeals, Ruderman took any required credit applications from the dealer to Barlaam, who delivered the completed applications to the dealers.

## The 2009 Rolls Royce Phantom Sapphire (the "Rolls Royce")

One of the debts implicated in these appeals arises from Barlaam's lease of a 2009 Rolls Royce Phantom Sapphire (the "Rolls Royce"). Barlaam had previously leased three vehicles from Tim O'Hara ("O'Hara"), general manager of O'Gara Coach Company ("O'Gara"). Acting on Barlaam's instructions, Ruderman requested that O'Hara locate a special edition Rolls Royce for Barlaam. When O'Hara found such a car, Ruderman went to the O'Gara dealership and obtained from O'Hara the "sticker" concerning the Rolls Royce, and the basic figures for a possible lease. After reviewing this information, Barlaam instructed Ruderman to return to O'Gara and negotiate the terms for a lease of the Rolls Royce, which included a trade-in of one of the Ferraris he was leasing. Ruderman returned to O'Gara on December 27, 2008, and negotiated a

-3-

lease of the Rolls Royce.

That same day, a credit application for Barlaam was electronically submitted by O'Gara to BMW FS and entered into the BMW FS "APPRO" software system. One of the key disputes in this appeal is who provided the information that was sent by O'Gara to BMW FS via the APPRO system, and who filled out the information on the written application that was given to O'Gara, which Barlaam had signed. The information submitted to APPRO was, in some respects, incorrect, including a variance on Barlaam's social security number. Even so, the APPRO system identified Barlaam as a prior customer. Three days later, after two credit analysts at BMW FS reviewed the credit application information, BMW FS notified O'Gara that it had approved Barlaam's application to lease the Rolls Royce.

Barlaam personally went to the O'Gara dealership and signed the lease and other required documents, including the credit application. It is disputed whether, and to what extent, Barlaam examined the credit application before signing it. The bankruptcy court would later determine that the credit application contained material errors, including an incorrect statement of Barlaam's annual gross income, which the application showed to be $720,000.

The Rolls Royce lease that Barlaam executed required him to make an initial payment of $15,000, together with forty-eight monthly payments of $6,193.26. After completing the paperwork, Barlaam took possession of the Rolls Royce; O'Gara then assigned the lease to BMW FS. After making seventeen timely monthly payments, Barlaam defaulted in June 2010. At some point, Barlaam surrendered the Rolls Royce, which was sold by BMW FS at a dealer

-4-

auction for $246,000.

## The BMW 750i

Barlaam reserved use of the Rolls Royce for "special" occasions. In his view, he needed an "everyday" car, one with good headrest support; Barlaam found that BMW cars were comfortable. Barlaam had no prior contact with BMW dealers, and assigned Ruderman to seek out a dealership, a car, and a deal.

Ruderman went to the Steve Thomas BMW dealership to discuss a potential lease of a BMW 750i (the "750i"). Neither Ruderman nor Barlaam had prior dealings with Steve Thomas BMW. The dealership manager provided him with the lease numbers for the 750i. Ruderman phoned Barlaam, who agreed to the deal.

Steve Thomas BMW submitted an electronic credit application for the proposed Barlaam lease to BMW FS on April 19, 2010. In it, Barlaam's gross annual income was listed as $520,000. After analysis via the APPRO software by a credit analyst, BMW FS approved the lease application the same day.

Barlaam went to Steve Thomas BMW and signed all of the required documents for the transaction, including the credit application and lease. Again, it is disputed whether and to what extent Barlaam examined the credit application before he signed it. The lease Barlaam signed provided that Barlaam would pay $2,861.36 at signing, and then make thirty-six monthly payments of $1,618.00. After completing the paperwork, Barlaam took possession of the 750i. Steve Thomas BMW assigned the lease to BMW FS.

After making eleven timely lease payments on the 750i, Barlaam defaulted in March 2011. The 750i was later sold at

-5-

dealer auction for $79,500.

## The Bankruptcy and Adversary Proceeding

Barlaam filed a petition for relief under chapter 7 on March 18, 2011. The bankruptcy court granted BMW FS's unopposed motion for relief from stay to repossess and sell the Rolls Royce and 750i, which it did.

On June 3, 2011, BMW FS filed a complaint against Barlaam seeking an exception to discharge under § 523(a)(2)(B) for the remaining amounts due on Barlaam's leases of the Rolls Royce and 750i after application of the sales proceeds. BMW FS alleged that the two credit applications Barlaam signed and submitted to lease the vehicles contained materially false representations as to his financial condition; that he submitted them with the intent not to pay his obligations; and that BMW FS reasonably relied on the false credit applications in extending credit to Barlaam in the leases. In addition to the discharge exception, BMW FS also sought a money judgment against Barlaam equal to the unpaid amount due on the leases, together with an award of attorney's fees and costs.

Barlaam, appearing initially pro se in the adversary proceeding, answered the complaint with a general denial. Barlaam filed a motion to dismiss the complaint, arguing that BMW FS's reliance on the credit applications could not have been reasonable, as required by § 523(a)(2)(B)(iii), because he did not personally supply the allegedly false information contained in the credit applications. The bankruptcy court treated this as a motion for summary judgment and BMW FS submitted its own summary judgment motion, arguing that there were no disputed issues of

-6-

fact as to each of the elements for exception to discharge under § 523(a)(2)(B).

The bankruptcy court conducted a hearing on the competing summary judgment motions and then entered a Memorandum of Opinion Regarding Plaintiff and Defendant Motions for Summary Judgment ("SJ Memorandum"). The court concluded that, of the seven required elements for an exception to discharge under § 523(a)(2)(B), BMW FS had established the materiality of the representations in the credit applications, Barlaam's knowledge of their falsity, Barlaam's intent to deceive BMW FS, and that BMW FS had suffered damages proximately caused by Barlaam's misrepresentations. However, the bankruptcy court determined that the undisputed facts did not support the other three required elements for a BMW FS discharge exception, and that a trial would be required to examine whether Barlaam actually made the misrepresentations, whether BMW FS actually and reasonably relied on the misrepresentations, and the amount of damages to BMW FS.

A two-day trial followed, at which the court heard testimony from Barlaam, Ruderman, and Kenneth Cioli, a national credit manager for BMW FS. The court entered a Memorandum of Opinion Regarding Judgment for Plaintiff After Trial on July 31, 2013 (the "Trial Memorandum"). The court found that Barlaam and Ruderman were, generally, not credible, and that the testimony of Cioli was credible. In addition to restating its conclusions about the facts established in the SJ Memorandum, the court made several additional critical fact findings and legal conclusions:

- "Barlaam was aware of the falsity of his income as filled out on the credit applications he signed before delivery of the

-7-

cars was made. The Court finds that he reviewed the credit applications and knew of the inaccuracies and accepted these as true statements through the act of signing them." Trial Memorandum at 17.

- "BMW FS did rely on the information provided on the credit applications and only authorized the dealership to hand over the keys to the car[s] once Barlaam had signed the required documents." Trial Memorandum at 19.

- "This Court has already found that the process by which BMW FS makes its credit decisions is reasonable and that to rely on Defendant's statements without further independent inquiry is also reasonable." Trial Memorandum at 19.

- "The damages incurred by Plaintiff through both leases total $118,470.85." Trial Memorandum at 23.

- "The attorney's fees clause [in the leases]. . . is simply not broad enough to cover fraud in the inducement. . . . Plaintiff's request for attorney's fees is denied." Trial Memorandum at 25.

Based upon these findings and conclusions, the bankruptcy court entered the Judgment, awarding $118,924.22 in damages to BMW FS, and determining that the award was excepted from discharge under § 523(a)(2)(B). The Judgment denied BMW FS' request for an award of attorney's fees and costs.

Barlaam filed a timely appeal of the Judgment on August 9, 2013.

BMW FS filed a motion under Rule 9023, which incorporates Civil Rule 59(e), to amend the Judgment on August 13, 2013, arguing that, under the terms of both leases, it was entitled to

recover its attorney's fees and costs. Barlaam opposed the motion, asserting that the plain language of the leases did not allow for an award of attorney's fees in what was essentially an action for fraud. In a Memorandum of Opinion Denying Plaintiff's Motion to Amend (the "Reconsideration Memorandum"), the court reaffirmed its conclusion in the Trial Memorandum that the attorney's fee provision in the leases referred only to "collection" of amounts due under contract, not tort claims, and again denied BMW FS's request for attorney's fees. An order denying the BMW FS motion was entered on October 1, 2013 (the "Reconsideration Order").

BMW filed a timely appeal of the Reconsideration Order and a timely cross-appeal of the portion of the Judgment denying its request for attorney's fees.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(I). We have jurisdiction under 28 U.S.C. § 158.

## ISSUES

Whether the bankruptcy court erred in determining that Barlaam's debts to BMW FS were excepted from discharge under § 523(a)(2)(B).

Whether the bankruptcy court abused its discretion in denying BMW FS's request for attorney's fees.

## STANDARDS OF REVIEW

In reviewing a bankruptcy court's determination of an exception to discharge, we review its findings of fact for clear error and its conclusions of law de novo. Oney v. Weinberg (In re Weinberg), 410 B.R. 19, 28 (9th Cir. BAP 2009).

-9-

We review the bankruptcy court's decision to award or deny attorney's fees for abuse of discretion, but any elements of statutory interpretation which figure in the bankruptcy court's decision are reviewable de novo. Evon v. Law Offices of Sidney Mickell, 688 F.3d 1015, 1032 (9th Cir. 2012). Under the abuse of discretion standard, we "affirm unless the [bankruptcy] court applied the wrong legal standard or its findings were illogical, implausible or without support in the record." Gonzalez v. City of Maywood, 729 F.3d 1196, 1201-02 (9th Cir. 2013).

The bankruptcy court's interpretation of contract terms is reviewed de novo. United States v. 300 Units of Rentable Hous., 668 F.3d 1119, 1122 (9th Cir. 2012).

**DISCUSSION**

**I.**

**The bankruptcy court did not err in deciding that Barlaam's debts to BMW FS were excepted from discharge under § 523(a)(2)(B).**

A debt resulting from a creditor's reasonable reliance on a debtor's written false representation concerning his or her financial condition may be excepted from discharge under § 523(a)(2)(B), which provides:

(a) A discharge under . . . this title does not discharge an individual debtor from any debt . . . (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by . . . (B) use of a statement in writing – (I) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive[.]

The Ninth Circuit has enumerated the necessary elements for a § 523(a)(2)(B) discharge exception, requiring that there be a

-10-

writing that contains: "(1) a representation of fact by the debtor, (2) that was material, (3) that the debtor knew at the time to be false, (4) that the debtor made with the intention of deceiving the creditor, (5) upon which the creditor relied, (6) that the creditor's reliance was reasonable, [and] (7) that damage proximately resulted from the representation." Candland v. Ins. Co. of N. Am. (In re Candland), 90 F.3d 1466, 1469 (9th Cir. 1996) (quoting Siriani v. Nw. Nat'l Ins. Co. (In re Siriani), 967 F.2d 302, 304 (9th Cir. 1992)). The creditor seeking an exception must prove these elements by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 291, 111 S. Ct. 654, 112 L. Ed. 2d 755 (1991).

The bankruptcy court addressed and made appropriate findings on each of these seven criteria in the SJ Memorandum and Trial Memorandum. As discussed below, we find no error in the court's decision that Barlaam's debt to BMW FS is excepted from discharge under § 523(a)(2)(B).

**A.    There must be a statement in writing by the Debtor containing a false representation of fact.**

At the heart of this appeal are two credit applications executed by Barlaam, one in 2008 in seeking lease financing for the Rolls Royce, the other in 2010 to support the lease financing for the 750i. The credit applications each contain information about Barlaam's allegedly then-current annual income. A credit application containing information about an applicant's income constitutes a statement in writing respecting the applicant's financial condition for purposes of § 523(a)(2)(B). Cashco Fin. Servs. v. McGee (In re Cashco), 359 B.R. 764, 768 (9th Cir. BAP

-11-

2006); Bayer Emples. Credit Union v. Sapp (In re Sapp), 364 B.R. 618, 627 (Bankr. N.D. W.Va. 2007) (holding that it is axiomatic that a signed credit application is a writing considered under § 523(a)(2)(B)(ii)).

Barlaam testified that he signed the credit application for the Rolls Royce at the O'Gara dealership on December 30, 2008. He acknowledged in that testimony that the line on the application directly above his signature states, in part, "This information in the application is true and correct to the best of my knowledge." Trial Tr. 81:24-25. Barlaam also testified that he signed the credit application for the 750i at Steve Thomas BMW on April 23, 2010. The two credit applications are identical in form, and the 750i application likewise contained the same assurance by Barlaam that the information in the application was true and correct.

On the Rolls Royce application, submitted in 2008, Barlaam's gross annual income was listed at $720,000. On the 750i application, submitted in 2010, Barlaam's gross annual income was listed at $520,000. However, the evidence presented to the bankruptcy court in connection with the summary judgment motions and at trial showed that Barlaam's income at those times was much, much lower. For example, Barlaam's federal income tax return for 2008 was submitted to the bankruptcy court in connection with the summary judgment motions, and it reported Barlaam had adjusted gross income of just $8,852 for that year. Barlaam had testified at his § 341(a) meeting of creditors in the bankruptcy case under penalty of perjury that he earned about $100,000 in 2008. And Barlaam testified at trial, confirming the amounts reported on his 2008 tax return and in his comments at the § 341(a) meeting.

-12-

The disparity between income reported on the 750i credit application, $520,000, and the documents submitted by BMW FS in the summary judgment proceedings was also striking. Barlaam's income on his 2010 federal return was a negative ($54,312). Barlaam's Statement of Financial Affairs filed in his bankruptcy case stated his income for 2010 was only $13,800.

At best, then, based upon this evidence, there was a serious question of fact as to the amount of Barlaam's income in 2008 and 2010. And based on the evidence in the record, the bankruptcy court was justified in finding that the income information in the credit applications was false. In other words, the two credit applications were writings about Barlaam's financial condition within the meaning of § 523(a)(2)(B) and they contained false information. Barlaam does not dispute this.

What has been heatedly contested, however, was the source of the income information contained in the credit applications. Both Barlaam and Ruderman testified that neither of them provided the information used in the credit applications and, instead, that for both the Rolls Royce and 750i credit applications, it was the dealers that provided the information sent to BMW FS.

The only testimony heard by the bankruptcy court concerning the source of the information on the credit applications came from Barlaam and Ruderman; there was no testimony or declarations from the dealers. Indeed, Ruderman speculated in his testimony that the Rolls Royce dealer, in the midst of the 2008 recession with few sales, was so desperate to make a sale that O'Hara might have made up information submitted in the credit application to BMW FS. But the bankruptcy court discounted this speculation, concluding

-13-

instead that the Rolls Royce dealer "had every reason to believe Barlaam would qualify." The record amply supports this finding. Indeed, Barlaam had paid over $300,000 for the 2005 Rolls Royce purchased through O'Gara and, as far as the dealer knew, Barlaam had an unblemished credit history.

In addition, Ruderman's credibility was cast into doubt concerning his comments that the Steve Thomas BMW manager who sold Barlaam the 750i told him that he would submit the credit information electronically from information already existing in the system. The bankruptcy court, however, had testimony from Ken Cioli, national credit manager for BMW FS, attesting that a local BMW dealer would not have access to BMW FS's financial databases and, because there was no prior business relationship between Barlaam and Steve Thomas BMW, there would be no information in their computer files about him. Moreover, Cioli pointed out, in the unlikely event that Steve Thomas BMW somehow got access to the BMW FS databases, it would have found that Barlaam had reported his income in 2008 to be $720,000, and the dealer would not likely have plucked the $520,000 income out of thin air.

The bankruptcy court also found that Barlaam lacked credibility concerning numerous issues and, in particular, in connection with his repeated assertions that he never read the information on the credit applications before he signed them. Indeed, Barlaam's position is inconsistent with his other testimony:

> BMW FS COUNSEL: When you came in on both occasions for the [Rolls Royce} Phantom and for the [750i] BMW, you didn't read any of the documents? You just signed them? . . .

-14-

BARLAAM: Ask again the question, because you're confusing me.

BMW FS COUNSEL: You just signed and didn't read any of the documents. You just signed them.

BARLAAM: No, I glanced over to see what I was signing. I didn't review every single word.

Trial Tr. 91:13-18, July 8, 2013. Based upon this testimony, the bankruptcy court explained:

While Barlaam repetitively asserts that he did not even turn over the credit application, he also stated that he scanned the documents before signing them. Each credit application is only a single page, no small print, and includes just a few numbers. Because he scanned it, he could not possibly have missed the errors.

Trial Memorandum at 14.

We discuss below the evidence concerning Barlaam's intent to deceive. But for purposes of this element of the § 523(a)(2)(B) exception, we conclude that the bankruptcy court did not clearly err in determining that Barlaam made written [mis]representations of fact concerning his financial condition. In re Candland, 90 F.3d at 1466 (instructing that whether there was a misrepresentation is a question of fact for the bankruptcy court reviewed on appeal for clear error.).

**B. The misrepresentation must be material.**

To constitute a material misrepresentation under § 523(a)(2)(B), the debtor's statement must be substantially inaccurate, and of the type that would affect the creditor's decision making process:

To except a debt from discharge, the creditor must show not only that the statements are inaccurate, but also that they contain important and substantial untruths. . . . Material misrepresentations for this statutory section are substantial inaccuracies of the

-15-

type which would generally affect a lender's or guarantor's decision. . . . Significant misrepresentations of financial condition — of the order of several hundred thousand dollars — are of the type which would generally affect a lender's or guarantor's decision.

In re Candland, 90 F.3d at 1470 (citing First Interstate Bank of Nev. (In re Greene), 96 B.R. 279, 283 (9th Cir. BAP 1989)); Tallant v. Kaufman (In re Tallant), 218 B.R. 58, 71 (9th Cir. BAP 1998) ("'Material falsity' in a financial statement can be premised upon the inclusion of false information or upon the omission of information about a debtor's financial condition.").

In the bankruptcy court's SJ Memorandum, it found the misrepresentation of Barlaam's income on the two credit applications to be material:

The misrepresentations of $100,000s of Defendant's income are precisely the type of misrepresentations cited by Candland that would affect a lender's decision to lend. They were material both (1) in the sense that income is one of the most (if not the most) important facts in the application and (ii) the amount of the income misstatement.

SJ Memorandum at 11.

The bankruptcy court's finding on materiality is supported by evidence in the record of the summary judgment proceedings. The team leaders of the two credit analyst groups at BMW FS that approved the Barlaam applications submitted declarations that included the following comments:

Had [BMW FS] known that [Barlaam's] income was either zero or $13,800, [BMW FS] would never have approved the application on behalf of [Barlaam] as there would have been no income stream to support the lease, much less support all his other credit obligations and living expenses.

Declaration of Donald Skeen [Team Leader of the BMW FS credit

-16-

analyst team that approved the Rolls Royce lease] at 6, July 3, 2012.

> Had [BMW FS] known that [Barlaam's] income was either zero or $100,000, [BMW FS] would never have approved the application on behalf of [Barlaam] as there would have been no income stream to support the lease, much less support all his other credit obligations and living expenses.

Declaration of Jason Bozarth [Team Leader of the analyst team that approved the 705i lease] at 7, July 3, 2012.

The bankruptcy court's finding on materiality was further supported at trial by the testimony of Cioli:

> BMW FS COUNSEL: And had Mr. Barlaam's annual income actually been $13,800 for the month, would that have been something you would approve the deal on? $13,800 a year? . . .
>
> [CIOLI]: No. That dollar amount per year wouldn't support — it wouldn't support one of the Rolls Royce payments.

Trial Tr. 160:3-14, July 9, 2013.

Here, the bankruptcy court did not clearly err in finding that the misrepresentations concerning Barlaam's income on the two credit applications were material. In re Nelson, 561 F.2d 1342, 1347 (9th Cir. 1977) (materiality is a question of fact reviewed for clear error).

**C. The debtor knew the misrepresentation at the time to be false and that the debtor made it with the intention of deceiving the creditor.**

Knowledge of the falsity of Barlaam's representations of income on his credit applications can be inferred from the bankruptcy court's analysis of the other discharge exception factors discussed above. Because Barlaam admitted that he "glanced over" the documents before signing them, in the words of

-17-

the court, the bankruptcy court was entitled to find that he was aware of the errors in the applications concerning his income. Indeed, both credit applications overstated his income by over a half million dollars a year. The court concluded in its SJ Memorandum that Barlaam had to have known that the income statement was untrue. SJ Memorandum at 12. We find no error in this finding.

But even if Barlaam had been completely truthful in insisting that he signed the applications without reading them "word for word," considering the significance of these transactions, this practice would still amount to the sort of gross recklessness from which the bankruptcy court could impute Barlaam's knowledge of both the falsity of the statements and his intent to deceive BMW FS. As another trial court, cited in this case by the bankruptcy court, commented:

> [A d]ebtor cannot simply sign a document that purports to describe his own financial condition without reading or questioning anyone as to its contents and then be held blameless if the statement contains materially false information. A creditor need not establish that the debtor had actual knowledge of the falsity of the representation in order to prevail under section 523(a)(2). He may satisfy this element of the required showing by proving that the false statement "was either knowingly made or made with sufficient recklessness as to be fraudulent."

Merchants Bank of Cal. v. Oh (In re Oh), 278 B.R. 844, 858 (Bankr. C.D. Cal. 2002) (quoting Alside Supply Ctr. v. Aste (In re Aste), 129 B.R. 1012, 1017 (Bankr. D. Utah 1991)).[5]

Besides serving to impute the knowledge of falsity, a finding

---

[5] The Oh and Alside Supply Cr. cases are the progeny of Cent. Nat'l Bank & Trust Co. v. Liming (In re Liming), 797 F.2d 895, 897 (10th Cir. 1986) ("a statement need only be made with reckless disregard for the truth . . . . under § 523(a)(2)(B)").

-18-

that a debtor acted with gross recklessness satisfies the element of intentional deception in § 523(a)(2)(B)(iv). Knoxville Teachers Credit Union v. Parkey, 790 F.2d 490, 492 (6th Cir. 1986); Se. Neb. Coop. Corp. v. Schnuelle (In re Schnuelle), 441 B.R. 616, 624 (8th Cir. BAP 2011) ("An intent to deceive can also be established by a debtor's reckless indifference and reckless disregard of accuracy of information on a financial statement."); Gertsch v. Johnson & Johnson Fin. Corp. (In re Gertsch), 237 B.R. 160, 167-68 (9th Cir. BAP 1999) (courts look to the totality of the circumstances, including a reckless disregard for the truth, to determine whether debtors intended to deceive). See also Texas American Bank, Tyler, N.A. v. Barron (In re Barron), 126 B.R. 255, 260 (Bankr. E.D. Tex. 1991) (Proof of intent to deceive does not require the demonstration that the debtor acted with a malignant heart but only that the debtor's actions demonstrate reckless indifference to the actual facts.). Since few debtors admit to a deceitful intent, all facts, including circumstantial evidence, may be relied upon in making the determination as to intent. Devers v. Bank of Sheridan (In re Devers), 759 F.2d 751, 754 (9th Cir. 1985).

The bankruptcy court found that Barlaam's intent to misrepresent his income so as to deceive BMW FS can be inferred from the totality of the circumstances, especially the gross recklessness he displayed in signing the credit applications allegedly without reviewing them. The bankruptcy court's finding on this point was not clearly erroneous. Runnion v. Pedrazzini (In re Pedrazzini), 644 F.2d 756, 758 (9th Cir. 1981) (Knowledge of the falsity or deceptiveness of a statement and intent to

-19-

deceive are questions of fact.).

**D. The creditor must reasonably rely on the misrepresentation.**

There is ample evidence in the record to sustain the bankruptcy court's finding that BMW FS reasonably relied on Barlaam's representations about his income in approving the credit applications. Barlaam disputes this finding, arguing that BMW FS did not rely on his income statements but, instead, on a host of other factors, such as Barlaam's then-impeccable credit record. In support of Barlaam's argument, he provided various training documents used by BMW FS credit analysts, none of which discuss "income" as a factor in making credit decisions.

The bankruptcy court acknowledged that, based on the evidence, income was not the only criterion used by BMW FS in approving a credit application. Trial Memorandum at 17. However, Cioli testified at trial that it was the first criterion. According to him, after the credit application information is transmitted from the dealer to BMW FS's APPRO computer system, the APPRO program presents the "Big Picture" as the first screen seen by the credit analyst. The Big Picture takes the income reported and makes several calculations, including total debt to income, and payment to income. If those calculations are not within the acceptable parameters or "rules" for the particular amount of the credit, it is unlikely that the loan will be approved. In particular, Cioli explained that Barlaam's debt to income, and payment to income, calculations for lease transactions of this size were excellent when the annual income figure used was $720,000 or $520,000 per year, but that the deals would not be

approved if the income reported on his bankruptcy schedules were instead considered by BMW FS. In contrast, all of the evidence submitted by Barlaam dealt with procedures that would take place in analyzing his credit applications only <u>after</u> the Big Picture had measured his income and made its calculations.

A related argument posed by Barlaam was that the credit applications were actually approved before he signed them, and thus BMW FS did not actually "rely" on the written applications. However, the bankruptcy court disposed of this argument, again based on Cioli's testimony, because it found that the loan approvals were all "contingent" upon receipt of the written signature of the borrower on the credit applications. Cioli testified that "[w]e have to have an original signature so that we legally know that the customer signed and agreed to the information on the application." Trial Tr. 195:22-25. He also indicated, without contradiction, that dealers are under instructions not to release cars to lessees without a signed credit application.

On this record, the bankruptcy court did not clearly err in determining that BMW FS actually relied on the false representations concerning Barlaam's income in the credit applications. But was it reasonable for BMW FS to do so?

Reasonable reliance under § 523(a)(2)(B) means reliance that would have been reasonable to a hypothetical average person. <u>Heritage Pac. Fin. LLC v. Machuca (In re Machuca)</u>, 483 B.R. 726, 736 (9th Cir. BAP 2012). Reasonable reliance is analyzed under a "prudent person" test. <u>Cashco Fin. Servs., Inc. v. McGee (In re McGee)</u>, 359 B.R. 764, 774 (9th Cir. BAP 2006);

*In re Cacciatori*, 465 B.R. at 555 (bankruptcy court must objectively assess the circumstances to determine if creditor exercised degree of care expected from a reasonably cautious person in the same business transaction under similar circumstances). Reasonable reliance is judged in light of the totality of the circumstances on a case-by-case basis. *In re Machuca*, 483 B.R. at 736. A creditor is under no duty to investigate in order for its reliance to be reasonable. *In re Gertsch*, 237 B.R. at 170 ("[A]lthough a creditor is not entitled to rely upon an obviously false representation of the debtor, this does not require him or her to view each representation with incredulity requiring verification."). Furthermore, a creditor's reliance may be reasonable if it adhered to its normal business practices. *Id.* at 172.

In the bankruptcy court, Barlaam challenged whether it was reasonable for BMW FS to accept his credit applications given the numerous errors in them (e.g., an incorrect social security number and phone number, and his claim to own a home "free and clear" while the application also listed a mortgage payment). However, Barlaam has not continued these challenges on appeal and only challenges the actual reliance, as discussed above. Barlaam's arguments about the reasonableness of BMW FS' reliance on the credit applications are therefore waived. *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1035 (9th Cir. 2011) (arguments not raised in opening brief are waived).

But even if these arguments were not waived, a creditor's reliance may be reasonable if it has a well-organized set of business practices that it adheres to. *In re Gertsch*, 237 B.R. at

-22-

170. In this appeal, there is no dispute that BMW FS's handling of the two credit applications was consistent with its normal business practices.

In sum, on this record, the bankruptcy court did not clearly err in determining that BMW FS actually and reasonably relied on the misrepresentations of Barlaam about his income in the credit applications. In re Nelson, 561 F.2d at 1347 (determination of reliance and reasonable reliance are questions of fact reviewed for clear error).

**E.    The creditor suffered damages proximately resulting from the misrepresentation.**

On appeal, Barlaam has not challenged the bankruptcy court's computation and determination that BMW FS was damaged in the amount of $118,470.85 as a result of the misrepresentations of Barlaam.

**F.    The lease debts were excepted from discharge.**

Based upon our review of the record, we conclude that the bankruptcy court did not clearly err in the various fact findings it made to support its decision that Barlaam's debts to BMW FS were excepted from discharge under § 523(a)(2)(B). While the evidence is in some respects disputed, adequate proof was offered by BMW FS to show that Barlaam submitted false information to BMW FS about his annual income in the credit applications to induce BMW FS to give him credit in connection with the Rolls Royce and 750i leases. The bankruptcy court's Judgment so holding is AFFIRMED.

-23-

## II.

### The bankruptcy court abused its discretion in declining to award attorney's fees to BMW FS.[6]

BMW FS argues that the bankruptcy court should have awarded it the attorney's fees and costs it incurred in successfully prosecuting the § 523(a)(2)(B) action against Barlaam. We agree.

There is no independent right to recover attorney's fees in an adversary proceeding in a bankruptcy case. Heritage Ford v. Baroff (In re Baroff), 105 F.3d 439, 441 (9th Cir. 1997). The prevailing party may be awarded attorney's fees, however, if attorney's fees would have been awarded under substantive state law. Id. (citing In re Johnson, 756 F.2d 738, 741 (9th Cir. 1985)). Here, the applicable "substantive, nonbankruptcy law" is California state law. S. Cal. Permanente Med. Grp. v. Ehrenberg (In re Moses), 215 B.R. 27, 32 (9th Cir. BAP 1997).

California law enforces parties' agreements concerning

---

[6] The bankruptcy court's decision to deny BMW FS's request for an award of attorney's fees and costs is the focus of both BAP. No. CC-13-1503, BMW FS's cross-appeal of the bankruptcy court's Judgment, and BAP No. CC-13-1500, BMW FS' appeal of the court's order denying its motion to amend the Judgment. A cross-appeal is proper when a party seeks to enlarge its substantive rights or decrease its monetary liabilities. Lee v. Burlington N. Santa Fe Ry. Co., 245 F.3d 1102, 1107 (9th Cir. 2001). The cross-appeal is a rule of practice, and the appellate court has broad authority to make such dispositions as justice requires. Mahach-Wilson v. Depee, 593 F.3d 1054, 1063 (9th Cir. 2010). On the other hand, an appeal of reconsideration of an order under Civil Rule 59(e) is a disfavored practice, requiring that the appellant show: (1) newly discovered evidence; (2) clear error or manifest injustice; or (3) intervening change in controlling law. Duarte v. Bardales, 526 F.3d 563, 567 (9th Cir. 2008). Below, we reverse the decision of the bankruptcy court in BAP No. CC-13-1503, the cross-appeal. As a result, we need not reach the questions raised in BAP No. CC-13-1500, because the relief BMW FS requests in that appeal is the same as that granted on the cross-appeal, and BMW FS is otherwise not prejudiced.

-24-

recovery of attorney's fees. Cal. Code Civ. Proc. § 1021 provides:

> Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys and counselors at law is left to the agreement, express or implied, of the parties[.]

Section 1021 permits recovery of attorney's fees by agreement between the parties in actions sounding in tort as well as contract. Redwood Theaters, Inc. v. Davison (In re Davison), 289 B.R. 716, 724 (9th Cir. BAP 2003) ("CCP § 1021 does not limit the recovery of attorney's fees to [contract] claims . . . . [A]ttorney's fees may be recoverable under CCP § 1021 even though they are not recoverable under CC § 1717[7] . . . . California law permits recovery of attorney's fees by agreement, for tort as well as contract actions.").[8]

The decision by a bankruptcy court determining the dischargeability of a debt under § 523(a)(2)(B) resolves a tort claim. In re Candland, 90 F.3d at 1470. Moreover, whether a false statement injured a party requires the resolution of a tort claim under California law. Intel. Corp. v. Hamidi, 30 Cal. 4th

---

[7] Cal. Civ. Code § 1717 is limited to actions on a contract, and is not implicated in this appeal.

[8] Other provisions of California law relevant to the dispute in this appeal are: (1) Cal. Code. Civ. Proc. § 1332(b), which provides that "except as otherwise expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding"; and (2) Cal. Civ. Code § 1033.5(a)(10), which provides that attorney fees are "allowable as costs" when they are authorized by either contract, statute or law." These statutes evidence the intent of the California legislature to provide an entitlement to attorney's fees when the conditions of the statutes are met. Santisas v. Gordon, 17 Cal. 4th 599, 619 (1998).

1342, 1347 (2003).

Under California case law, if the parties' contract provides for the recovery of attorney's fees and costs, we are instructed to examine the language of the agreement to determine whether an award of attorney's fees is warranted. In re Tobacco Cases I, 193 Cal. App. 4th 1591, 1601 (2011). Here, the lease agreements signed by Barlaam for the Rolls Royce and the 750i both provide that:

> I [Barlaam] will be in default under this Lease if . . .
>
> * * *
>
> (g) Any information in my credit application or a guarantor's credit application is false or misleading.

Lease Agreements at ¶ 26(g). Within the same paragraph 26, the Lease Agreements explain the consequences of a default by the lessee, which includes:

> If I am in default, you may do any or all of the following:
>
> (e) require that I pay . . . . all fees and costs of collections, including attorneys' fees, court costs, interest, and other related expenses for all losses you incur in connection with my "default" of this Lease."

Id. at ¶ 26(e).

In reviewing paragraph 26 of the Lease Agreement, we note two salient points: (1) paragraph 26 contains the only provision providing for recovery of attorney's fees and costs by BMW FS, and it is the only provision listing the default conditions; (2) paragraph 26 explicitly labels providing false or misleading information on the credit application, a pre-contract formation act of fraud in the inducement, a default. Thus, Barlaam's misconduct in providing false credit applications at the inception

-26-

of the lease transactions was an event of default, which in turn authorized BMW FS to recover "all fees and costs of collections, including attorneys' fees [and] court costs . . . BMW FS incur[s] in connection with [Barlaam's] default."  ¶ 26(e).

The bankruptcy court denied BMW FS's request for an award of attorney's fees and costs, because:

> The Court is not persuaded that paragraph 26 taken as a whole provides for attorney's fees in a state court action for fraud in the inducement, or for any action in contract.  It does not have the broad sweep of the attorney's fees provisions that have been held to cover fees in tort actions.  Instead, the provision seems limited to actions in contract.  Attorney's fees are included within the general category of cost of "collections," which, under reasonable interpretation, refers to collections of amounts due under the contract.

Memorandum of Opinion Denying Plaintiff's Motion to Amend the July 31, 2013 Judgment for Plaintiff's After Trial to Include Attorney's Fees.  The bankruptcy court based its analysis of the attorney's fee question on its reading of a recent unpublished BAP decision, Sharma v. Salcido (In re Sharma), 2013 Bankr. LEXIS 2286 (9th Cir. BAP May 14, 2013).  We determine, however, that Sharma must be distinguished on its facts from the current appeal.

The Sharma case involved an award of attorney's fees for fraud in the inducement of a settlement agreement.  The fee provision provided:

> [I]t is agreed by the parties that all attorneys' fees and costs incurred as a result of or in connection to the LAWSUIT, mediation, and settlement shall be borne by the parties who incurred such attorneys' fees and costs.  Should suit be brought to enforce or interpret any part of this Agreement, the "prevailing party" shall be entitled to recover as an element of costs of suit and not as damages, reasonable attorneys' fees fixed by the Court.  The "prevailing party" shall be the party entitled to recover his/her/its costs of suit, regardless of whether such suit proceeds to final

-27-

judgment.

*In re Sharma*, 2013 Bankr. LEXIS at * 51.  On its face, this provision distinguishes between the ordinary costs of suit, to which the *Sharma* bankruptcy court applied the American Rule requiring parties to bear their own attorney fees, and any further action "to enforce or interpret" the agreement, for which the prevailing party would be entitled to attorney's fees.  The *Sharma* panel determined that the first clause set the baseline and general rule for application of attorney's fees, and that fees would only be recoverable in the restricted case of an action to enforce or interpret the settlement agreement.  *Id.* at *54.

There was no reference to fraud in the inducement in the *Sharma* agreement.  Since there was no provision in the *Sharma* agreement relating to fraud in the inducement, the contractual provision for interpretation and enforcement of the agreement would not apply to "events that occurred before contract formation."  *Id.*  The *Sharma* panel concluded that

> The attorney's fee provision in the Settlement Agreement is limited to actions to "enforce or interpret any part of this agreement."  The plain language of the provision is not broad enough to encompass a claim for fraud in the inducement.  See [*Exxess Electronixx v. Heger Realty Corp.*, 68 Cal. App. 4th 376, 380 (1998)]; *Xuereb v. Marcus & Milichap*, 3 Cal. App. 4th 1338, 1342 (1992)].  Under California law, a tort claim does not "enforce" a contract or operate to declare a party's rights under a contract.  *Exxess Electronixx*, 75 Cal. App. 4th at 1342.

*Id.*

However, unlike the *Sharma* case, the Lease Agreements in the current appeal include a specific "fraud in the inducement" clause.  As quoted above, paragraph 26 clearly provides that a fraud in the inducement of the agreement (i.e., the lessee's

-28-

provision of false or misleading information) was a defined event of default, and the occurrence of a default entitled the prevailing party to recover attorney's fees. Thus, the "plain language" of that provision in the Lease Agreements is not only "broad enough," but in fact explicitly commands, that BMW FS be able to recover its attorney's fees. In our view, the bankruptcy court's reliance on Sharma was therefore misplaced.

The bankruptcy court then applied a restrictive interpretation to what constitutes a "collection" action under the Lease Agreements. Instead, we view "collections," as used in the leases, as referring to the phrase "expenses for all losses you incur in connection with my 'default' of this Lease." In other words, if there is a default based on the lessee's provision of false and misleading information in the credit application, the attorney's fees provision would apply.

This conclusion is consistent with California state court case law interpreting attorney's fee provisions. "If a contractual attorney fee provision is phrased broadly enough . . . it may support an award of attorney fees to the prevailing party in an action alleging both contract and tort claims." Santisas v. Goodwin, 17 Cal. 4th at 608. In Santisas, the California Supreme Court addressed an attorney's fees provision that provided: "In the event legal action is instituted by the Broker(s), or any party to this agreement, or arising out of the execution of this agreement or the sale, or to collect commissions, the prevailing party shall be entitled to receive from the other party a reasonable attorney fee to be determined by the court in which such action is brought." 17 Cal. 4th at 603. Based upon the

-29-

plain language of the attorney's fee provision, the California Supreme Court stated this "provision embraces all claims, both tort and breach of contract . . . because all are claims 'arising out of the execution of the agreement or the sale.'" Id. at 608 (emphasis added).

Similarly, in Miske v. Bisno, the California Court of Appeals examined an attorney's fees provision found in a limited partnership agreement as it applied to a fraud in the inducement claim. 204 Cal. App. 4th 1249 (2012). The attorney's fees provision there provided: "If any dispute arises between the Partners, whether or not resulting in litigation, the prevailing party shall be entitled to recover from the other party all reasonable costs, including, without limitation, reasonable attorneys' fees." Id. at 1259. The court found that "the above attorney fee provision is broad enough to cover the type of fraud in the inducement claims brought against appellants." Id. (emphasis added); see also Lerner v. Ward, 13 Cal. App. 4th 155, 159 (1993) (finding attorney's fees appropriate in a tort action based upon a clause in the contract which provided "in any action or proceeding arising out of this agreement"); but see Redwood Theaters, Inc. v. Davison (In re Davison), 289 B.R. 716, 724 (9th Cir. BAP 2003) (applying California law and denying attorney's fees on a tort cause of action based upon a contract provision that limited recovery of such fees to those "necessary to enforce or to interpret the terms" of the contract); Exxess Electronixx v. Heger Realty Corp., 64 Cal. App. 4th 698, 707-08 (1998) (denying attorney's fees on a tort cause of action under an attorney's fees provision that fees were recoverable that are "incurred to enforce

-30-

the contract").

In this case, we conclude that the plain language of the provisions of the Lease Agreements is broad enough to encompass a claim by BMW FS against Barlaam for fraud in the inducement. In fact, the contracts expressly contemplate such a tort claim as an event of default, which in turn entitles BMW FS to recover its fees and costs of collections for all losses it incurred in connection with the default. Because it erred in its construction of the Lease Agreements, we conclude that the bankruptcy court abused its discretion in limiting recovery of attorney's fees only to those incurred in "collections" of amounts due under the contract. Further, the bankruptcy court abused its discretion by subjecting the terms of the parties' contracts defining the scope of actions in which attorney's fees and costs could be recovered to an overly narrow interpretation. We therefore REVERSE that portion of the bankruptcy court's Judgment denying attorney's fees and costs, and REMAND this action to the bankruptcy court for further proceedings consistent with this decision.

**CONCLUSION**

We AFFIRM the Judgment of the bankruptcy court determining that Barlaam's debt to BMW FS is excepted from discharge under § 523(a)(2)(B). We REVERSE that part of the Judgment, and the Order, denying an award of attorney's fees and costs to BMW FS and REMAND this action to the bankruptcy court for further proceedings consistent with this decision.